**UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| MICHAEL VALLIERES, Derivatively on Behalf of AFFIRM HOLDINGS, INC., | Case No.: |
| Plaintiff, | |
| v. | |
| MAX LEVCHIN, MICHAEL LINFORD, JEREMY LIEW, LIBOR MICHALEK, JENNY J. MING, CHRISTA S. QUARLES, KEITH RABOIS, JACQUELINE D. RESES, AND JAMES D. WHITE, | |
| Defendants, | |
| -and- | |
| AFFIRM HOLDINGS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Michael Vallieres, by and through his undersigned counsel, derivatively on behalf of Nominal Defendant Affirm Holdings, Inc. ("Affirm" or the "Company"), submits this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Affirm with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits and matters of public record.

**NATURE OF THE ACTION**

1

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Affirm.

### JURISDICTION

2.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).  Plaintiff's claims also raise a federal question pertaining to the claims made in the securities class actions entitled *In re Affirm Holdings, Inc. Sec. Litig.*, Case No. 3:22-cv-07770-WHO (N.D. Cal.) (the "Securities Class Action") based on violations of the Exchange Act.

3.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

4.      This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.      Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.  In addition, the Company's principal executive offices are in this District.

6.      The Company's Amended and Restated Bylaws provide a forum selection for certain actions:

> Unless the Corporation consents in writing to the selection of an alternative forum (an "Alternative Forum Consent"), the **Court of Chancery of the State of Delaware** shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a duty (including any fiduciary duty) owed by any current or former director, officer, stockholder, employee or agent of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the

Corporation arising out of or relating to any provision of the DGCL or the Certificate of Incorporation or these Bylaws (each, as in effect from time to time), or (iv) any action asserting a claim against the Corporation or any current or former director, officer, stockholder, employee or agent of the Corporation governed by the internal affairs doctrine of the State of Delaware; *provided*, *however*, that, the provisions of this Article IX will not apply to suits brought to enforce any liability or duty created by the Exchange Act or the rules and regulations under the Exchange Act, or any other claim for which the U.S. federal courts have exclusive jurisdiction; *provided further* that in the event that the Court of Chancery of the State of Delaware lacks subject matter jurisdiction over any such action or proceeding, the sole and exclusive forum for such action or proceeding **shall be another state or federal court located within the State of Delaware**, in each such case, unless the Court of Chancery (or such other state or federal court located within the State of Delaware, as applicable) has dismissed a prior action by the same plaintiff asserting the same claims because such court lacked personal jurisdiction over an indispensable party named as a defendant therein. Unless the Corporation gives an Alternative Forum Consent, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the sole and exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act of 1933, as amended. Failure to enforce the foregoing provisions would cause the Corporation irreparable harm and the Corporation shall be entitled to equitable relief, including injunctive relief and specific performance, to enforce the foregoing provisions. Any person or entity purchasing, otherwise acquiring or holding any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article IX. The existence of any prior Alternative Forum Consent shall not act as a waiver of the Corporation's ongoing consent right as set forth above in this Article IX with respect to any current or future actions or claims. [Emphasis added].

## **THE PARTIES**

### **Plaintiff**

7.      Plaintiff is, and was at relevant times, a shareholder of Affirm. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation. Plaintiff currently holds Affirm shares as of the filing of this Complaint.

### **Nominal Defendant**

8.      ***Nominal Defendant*** Affirm is a Delaware corporation.

### **Defendant Directors**

9.     *Defendant* **Max Levchin** ("Levchin") has served as a member of the Board of Directors (the "Board") since 2012.   For the fiscal year ended June 30, 2021 (the "2021 Fiscal Year"), Defendant Levchin received $451,207,726 in total compensation from the Company.  This included $10,000 in salary, $451,052,591 in option awards, and $145,135 in all other compensation.

10.     *Defendant Jeremy Liew* ("Liew") has served as a member of the Board since 2013. Defendant Liew has served as a member of the Nominating and Governance Committee since at least 2021 and as Chair of the Compensation Committee since at least 2021.  For the 2021 Fiscal Year, Defendant Liew received $246,601 in total compensation from the Company.  This included $46,583 in fees earned or paid in cash and $200,018 in stock awards.

11.     *Defendant Libor Michalek* ("Michalek") has been a member of the Company's Board since May 2021.  For the 2021 Fiscal Year, Defendant Michalek received $13,591,619 in total compensation from the Company.  This included $431,667 in salary, $3,220,073 in stock awards, $9,736,383 in option awards, and $203,496 in all non-equity incentive plan compensation.

12.     *Defendant Jenny J. Ming* ("Ming") has served as a member of the Board since February 2021 and as a member of the Audit Committee since 2021.  For the 2021 Fiscal Year, Defendant Ming received $887,539 in total compensation from the Company.  This included $25,625 in fees earned or paid in cash and $861,914 in stock awards.

13.     *Defendant Christa S. Quarles* ("Quarles") has served as a member of the Board since 2018. Defendant Quarles has served as Chair of the Audit Committee since at least 2021.  For the 2021 Fiscal Year, Defendant Quarles received $252,685 in total compensation from the Company. This included $52,667 in fees earned or paid in cash and $200,018 in stock awards.

14.     *Defendant Keith Rabois* ("Rabois") has served as a member of the Board since 2013 and as a member of the Audit Committee since at least 2021.

15.     **Defendant Jacqueline D. Reses** ("Reses") has served as a member of the Board since 2021.  For the 2021 Fiscal Year, Defendant Reses received $889,623 in total compensation from the Company.  This included $27,708 in fees earned or paid in cash and $861,914 in stock awards.

16.     **Defendant James D. White** ("White") has served as a member of the Board since 2021.  For the 2021 Fiscal Year, Defendant White received $888,581 in total compensation from the Company. This included $26,667 in fees earned or paid in cash and $861,914 in stock awards.

17.     **Defendant Michael Linford** ("Linford") has been the Company's Chief Financial Officer ("CFO") since 2018.  For fiscal years of 2021 and 2022, Defendant Linford received $13,576,678 and $7,324,809 in total compensation, respectively. Defendant Linford is named as a defendant in the Securities Class Action.

18.     The following Individual Defendants are collectively referred to as the "Director Defendants": Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses, and White.

19.     The following Individual Defendants are collectively referred to as the "Officer Defendants": Levchin and Linford.

20.     The following Individual Defendants are collectively referred to as the "Audit Committee Defendants": Ming, Quarles, and Rabois.

21.     The Individual Defendants and Nominal Defendant are collectively referred to as "Defendants."

**Non-Party**

22.     **Non-Party Noel Watson** ("Non-party Watson") has served as a member of the Board since September 2022.

## CODE OF BUSINESS CONDUCT AND ETHICS

23.     As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

24.     The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

25.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Affirm and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Individual Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

26.     The Individual Defendants owe to Affirm and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

27.     To discharge their duties, the officers and directors of Affirm were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls

of the affairs of the Company.  By virtue of such duties, the officers and directors of Affirm were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Affirm conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

28.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the

Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Affirm, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

29.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company. As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## THE COMPANY'S AUDIT COMMITTEE CHARTER

30.     Pursuant to the Company's Audit Committee Charter: "The purpose of the Audit Committee (the 'Committee') of the Board of Directors (the 'Board') of Affirm Holdings, Inc. (the 'Corporation') is to prepare the audit committee report required by the SEC to be included in the Corporation's annual proxy statement and to assist the Board in overseeing and monitoring: (i) the Corporation's accounting and financial reporting processes; (ii) the quality and integrity of the Corporation's financial statements and the auditing of those financial statements; (iii) compliance with legal and regulatory requirements; (iv) the Corporation's independent registered public accounting firm's qualifications and independence; (v) the performance of the Corporation's internal audit function; and (vi) the appointment, compensation, retention, oversight and performance of the Corporation's independent registered public accounting firm. The Committee shall also perform such further functions as may be consistent with this Charter or assigned by applicable law, the Corporation's certificate of incorporation or bylaws, or the Board."

31.     The following duties and responsibilities are within the authority of the Audit Committee, and the Audit Committee shall perform such duties consistent with and subject to applicable law and rules and regulations promulgated by the SEC, Nasdaq, or any other applicable regulatory authority:

32.     The Committee shall have the following duties and responsibilities with respect to the Corporation's annual audit and quarterly reviews:

(a)     Review and discuss with the Independent Auditor its annual audit plan, including the timing and scope of audit activities, and monitor such plan's progress and results during the year;

(b)     Review with management, the Independent Auditor and the leader of the Corporation's internal audit function, the following:

(i)     all critical accounting policies and practices to be used;

(ii)    any critical audit matters arising from the current period audit;

(iii)   all alternative treatments of financial information that the Independent Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor;

(iv)    all other material written communications between the Independent Auditor and management, such as any management letter and any schedule of unadjusted differences; and

(v)     any material financial arrangements of the Corporation which do not appear on the financial statements of the Corporation; and

(c)     Resolve all disagreements between the Independent Auditor and management regarding financial reporting.

33.     The Committee shall have the following duties and responsibilities with respect to the Corporation's financial reporting process and internal controls:

(a)     Review:

(i)     the adequacy and effectiveness of the Corporation's accounting and internal control policies and procedures on a regular basis, including

the responsibilities, budget, compensation and staffing of the Corporation's internal audit function, through inquiry and discussions with the Independent Auditor, management and the leader of the Corporation's internal audit function; and

(ii)     if applicable, the yearly report prepared by management, and attested to by the Independent Auditor, assessing the effectiveness of the Corporation's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Corporation's Annual Report on Form 10-K;

(b)     Review periodically with the Chief Executive Officer, Chief Financial Officer and the Independent Auditor:

(i)      all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Corporation's ability to record, process, summarize and report financial information; and

(ii)     any fraud, whether or not material, that involves management or other employees who have a significant role in the Corporation's internal control over financial reporting;

(c)     Discuss guidelines and policies governing the process by which senior management of the Corporation and the relevant departments of the Corporation, including the internal audit function, assess and manage the Corporation's exposure to risk, as well as the Corporation's major litigation and financial risk exposures and the steps management has taken to monitor and control such exposures it being understood that it is the job of management to assess and manage the Corporation's exposure to risk and that the Committee's responsibility is to discuss guidelines and policies by which risk assessment is undertaken;

(d)     Provide input to management regarding the selection, review and removal of the leader of the Corporation's internal audit function;

(e)     Review with management the progress and results of all internal audit projects, and, when deemed necessary or appropriate by the Committee, assign additional internal audit projects to the leader of the Corporation's internal audit function;

(f)     Review and discuss with the Independent Auditor the results of the year-end audit of the Corporation, including any comments or recommendations of the Independent Auditor, and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Corporation's financial statements should be included in the Annual Report on Form 10-K; and

(g)     Review the type and presentation of information to be included in the Corporation's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Corporation to analysts and rating agencies (which review may be done generally (*e.g.*, discussion of the types of information to be disclosed and type of presentations to be made), and the Committee need not discuss in advance each earnings release or each instance in which the Corporation may provide earnings guidance).

34.     The Committee shall have the following additional duties and responsibilities:

(a)     Meet periodically with the Chief Legal Officer, and outside counsel when appropriate, to review legal and regulatory matters, including

    (i)     any matters that may have a material impact on the financial statements of the Corporation and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Corporation or any of its directors, officers, employees or agents or breaches of fiduciary duty to the Corporation;

(b)     Review and approve or ratify, as appropriate, any transaction between the Corporation and any related person (as defined in Item 404 of Regulation S-K of the SEC) in accordance with the Corporation's Related Person Transactions Policy;

(c)     Prepare the audit committee report required by Item 407(d) of Regulation S-K to be included in the Corporation's annual proxy statement;

(d)     Review and approve in advance any services provided by the Independent Auditor to the Corporation's executive officers or members of their immediate family;

(e)     Review the Corporation's program to monitor compliance with the Corporation's Code of Conduct and Ethics (the "Code of Conduct"), and meet periodically with the Corporation's Chief Legal Officer to discuss compliance with the Code of Conduct […].

## SUBSTANTIVE ALLEGATIONS

### Background

35.     The Company is a subprime lender that receives most of its revenue from interest earned on loans that it originates or purchases from its bank partners, fees and gains from reselling

loans either through securitizations or directly to third party buyers like insurance companies or hedge funds, loan servicing fees, and interchange fees earned from debit cards.[1]  According to the Company's Annual Report filed with the SEC on Form 10-K for the fiscal year that ended on June 30, 2022 ("2022 Form 10-K"), over 65% of the Company's revenue was generated from these sources and their share of total revenues has grown even further since that time.

36.      The Company earns some of its revenue from "buy-now, pay-later" ("BNPL") products it labels "Split Pay" and "Core 0%" loans.  In Fiscal Years 2021 and 2022, these transactions have barely been over 20% of total gross merchandises value ("GMV").  While certain BNPL products charge no interest, the average percentage rate of interest across the portfolio of the Company's loan products is in the high 20s, a fact that Defendant Linford admitted at a Shareholder Fireside Chat held on December 6, 2022.

37.      Despite charging higher average rates than credit cards and affording consumers fewer protections, the Company repeatedly condemns "legacy" payment options like credit cards, and claims that the Company's platform is designed to avoid harmful and deceptive conduct prevalent in such legacy payment options because it is simple, transparent and "put[s] people first." Defendants' claims with respect to interest-free BNPL products were equally deceptive.  Throughout the Relevant Period, Defendants selectively promoted positive attributes of their BNPL offerings such as no late or hidden fees but omitted to disclose known predatory aspects detailed herein.

38.      The majority of the Company's overall loan volume remains interest-bearing, a fact acknowledged by Libor Michalek ("Michalek"), the Company's President of Technology, Risk and

---

[1]      A subprime lender is a credit provider that specializes in borrowers with low or "subprime" credit ratings.  Because these borrowers represent a higher risk of default, subprime loans are associated with relatively high rates of interest.  *See, e.g.*, https://www.investopedia.com/terms/s/subprimelender.asp.

Operations, at the Morgan Stanley Technology & Telecom Conference held on March 7, 2023. At this conference, Michalek explained that it was important for the Company to charge interest up to 36% given the Company's reliance on interest-bearing loans. In the last few years, most of the Company's loans were originated through Cross River Bank in New Jersey[2], but the Company has now shifted originations to other bank partners located in other states because interest rates over 30% are considered criminal usury in New Jersey.

### Regulatory Scrutiny of Risks to
### Consumers from the Company's BNPL Offerings

39.     In December 2021, known regulatory risks began to materialize when the Consumer Financial Protection Bureau ("CFPB") opened an inquiry into BNPL lending, an industry in which Affirm was a leading player. The CFPB ordered the Company and four of its competitors to collect information and raised concerns about the accumulation of debt by vulnerable consumers, regulatory arbitrage and data harvesting.

40.     On September 15, 2022, the CFPB released a Report entitled Buy Now, Pay Later: Market trends and consumer impacts ("CFPB Report" or "September 2022 Report"). The CFPB Report was based on feedback from state regulators, nonprofit organizations, and data provided by industry participants, including the Company, and provided an in-depth view of the Company's BNPL offerings. It confirmed that the Company's BNPL offerings carry serious risks of consumer harm.

---

[2]     On March 8, 2023. Cross River Bank stipulated to a Consent Order with the Federal Deposit Insurance Corporation in connection with the violations of fair lending laws and discriminatory underwriting practices.

41.     In March 2023, the CFPB published a new study on the demographic and financial profiles of BNPL customers, confirming that the Company and its peers prey on economically vulnerable individuals.

### The CFPB Investigation and Report Confirm
### That the Company Exposed Consumers to Harm

42.     On December 16, 2021, the CFPB opened an inquiry into companies that offer BNPL loans, ordering the Company and four of its competitors to submit data that would allow the CFPB to provide the public with information about industry practices and risks.  The CFPB's press release issued on the same day stated that the orders to submit marketing information were prompted by its concern that BNPL companies harvested consumer data, engaged in regulatory arbitrage and effectuated the harmful accumulation of debt.

43.     On September 15, 2022, the CFPB published the findings of this investigation.  Its findings were based on data that Affirm directly provided to the CFPB about its BNPL offerings for the years 2019 through 2021.  The Company produced data related to its financial performance as well as policies and procedures that concerned underwriting, repayment, late fees and product disputes.  In connection with the September 2022 Report, the CFPB also considered comments submitted to the agency by state regulators, nonprofit organizations and consumers. Contrary to Defendants' misrepresentations, the CFPB found that the BNPL industry was less transparent, not more transparent, than providers of legacy credit products like credit cards.

44.     The CFPB Report identified several vulnerabilities in the credit profile of a BNPL customer.  Half were 33 years old or younger, a demographic the Company admits targeting.  For example, at the conference organized by MoffettNathanson on May 11, 2021, Defendant Linford admitted that the Company targets younger consumers.

14

45.     Defendants Levchin and Linford have repeatedly claimed that the Company's BNPL offerings are designed to "level the playing field" for consumers because the Company does not charge late fees or deferred interest.  But, the CFPB Report demonstrates that late fees are only one aspect of harm to consumers and not as significant as Defendants Levchin and Linford claimed, and that all BNPL providers harmed vulnerable consumers in other ways, which were not accurately disclosed to shareholders.  According to the CFPB, only 10.5% of all borrowers are charged late fees and the late fees collected as a percentage of GMV for lenders who charge them was merely 0.28% in 2021.  Only 57% of late fees charged were actually collected in 2021. Nor can the risk of consumer harm be limited to incurring late fees or compounded interest as the September 2022 Report clearly shows.  In fact, the September 2022 Report identifies the Company as an example of an entity that enabled many harmful consequences for consumers.  It did not single out the Company as a positive example, as Defendants Levchin and Linford falsely claimed.  To the contrary, it identified numerous harmful practices to the five BNPL companies studied, and attributes them to the whole industry, including the Company.  For example, the CFPB expressed concern about how all five BNPL lenders required disputes to be resolved by merchants, causing inordinate time lags, and forcing consumers to continue installment payments of disputed amounts, basic protections that are available to credit card purchases but which the Company and its peers reject.

46.     The CFPB further cited with approval comments received during the pendency of the investigation, which concluded that the younger, lower-income borrowers the Company targets are at grave risk of buying more and accumulating more debt than they can afford.  It identified how forced autopay creates a risk of leading to overdraft and deprives borrowers of freedom of agency. It recognized the Student Borrower Protection Center's ("SBPC") serious concerns about how the Company and other BNPL lenders enable the financing for non-accredited "educational" institutions

like online cosmetology classes or fitness certifications, which are ineligible for genuine federal education loans. This harmful practice, which the Company embraced, has escalated over the last few years.

47. Further, the CFPB observed that the business model of BNPL lenders is driven by mobile phone apps. These apps, including the Company's, are designed to increase consumption and debt by "push[ing] customers" to retailers through referral links. They function as a virtual mall steering consumers to online retail transactions payable through BNPL loans. Machine learning is used to target those products and services that a consumer will find most tempting for prominent display. To emphasize these points, the CFPB quoted Defendant Levchin's May 2021 admission that the Company was "fundamentally a marketing device for merchants." It again singled out the Company as a Company that tries to "drive repeat" use, causing vulnerable consumers to become overburdened. As the CFPB concluded:

> BNPL lenders' shift toward proprietary app usage ***reinforces the common-sense notion that, when it comes to driving online purchase conversion, there is a strong financial incentive for a tech platform to expand its "home field advantage:" the extent to which it can keep a user on its own desired UX path***. As one submission to the CFPB's public BNPL request for comment put it: The BNPL model combines consumer surveillance, AI-driven data analytics, personalization, deep integration across platforms, retailers and applications, and real-time effects.

> That submission also offered an assessment of the consumer impact of the data-driven ecosystem that BNPL lenders have fostered: "We believe it will create an unfair and potentially costly environment for consumers, who are being lured—as BNPL companies openly claim—into spending more money at greater frequency." [Emphasis added].

48. The CFPB Report also highlighted concerns of consumer manipulation via the use of "dark patterns," which it considers a "deceptive design." Dark patterns are instances where companies exploit customer behavior to unwittingly coerce the customer into performing targeted actions. Examples of dark patterns include disguised advertisements that trick customers into

clicking on a link or trick questions that force answers in a manner that was not intended. The September 2022 Report credited academic research on the BNPL industry confirming the use of dark patterns. A comparison of checkout flow with dark patterns to one that did not include such deceptive devices showed that 82% of respondents exposed to them used BNPL as a payment option while only 59% of those who did not see dark patterns did so. Other studies discussed in the September 2022 Report confirmed that BNPL providers use experiential nudges to increase impulsive purchases. Notably, the September 2022 Report described this as an industry problem, suggesting that the Company, along with its peers engaged in this harmful and deceptive practice.

49.     The September 2022 Report also confirmed that the BNPL industry harvests consumer data. Defendants misleadingly claimed that they do not sell a customer's data to third parties. But, as the CFPB pointed out: "the fact that BNPL lenders usually restrict their data usage to 'first pay' scenarios does not eliminate potential consumer risks." Instead, it can be used to build profiles employed to promote specific products, and to deceptively drive consumer choices toward an intended goal.

50.     The CFPB identified serious risks of debt over extension given the individual profile of a typical BNPL borrower. These risks include loan stacking and sustained usage of BNPL offerings. Loan stacking occurs when a borrower takes out multiple loans from different BNPL lenders but is not able to repay some or all of them. According to the CFPB, loan stacking is particularly acute in the BNPL industry because companies like Affirm choose to run only soft credit inquiries, and thus do not have visibility into a borrower's loan activity on other BNPL platforms. Sustained usage of BNPL is perhaps the most troubling risk of them all. It occurs when frequent BNPL usage threatens a borrower's ability to meet other financial obligations such as paying for rent, utilities, mortgages, auto loans and student loans. This risk is not abstract.

51.     On June 18, 2021, at the RBC 2021 Capital Markets Financial Technology Conference, Defendant Linford admitted that the BNPL market in the United States is immature with low penetration rates compared to other countries.  The September 2022 Report cited studies and consumer surveys conducted in the United States too, which demonstrate that between 20% to 50% of BNPL borrowers regret their purchases, and 32% of them "delay[ed] or skipp[ed] paying an essential bill due to the payments on [their] Buy Now Pay Later plans."

52.     The CFPB Report's section on overextension risks identified the Company as a BNPL provider that touts higher average order value compared to other payment options as a measure of driving incremental sales.  The CFPB concluded that this data point suggests that consumers are "spending (and borrowing) more than they otherwise would."  The conclusion is reaffirmed by the fact that Affirm promotes "repeat usage" of BNPL to both merchants and investors as a key measure of its success.

53.     Defendants repeatedly mischaracterized the September 2022 Report's conclusions, claiming that it somehow whitewashed the Company's predatory practices.  Defendants' attempt to reimagine the CFPB Report's findings cannot be reconciled with the statements of CFPB Director Rohit Chopra ("Chopra"), released on the same day that the September 2022 Report became public. Chopra correctly concluded that BNPL is nothing more than a credit card substitute with fewer protections, similar to plans peddled decades ago.  He agreed that the risk of over extension in the BNPL industry is greater than in traditional payment methods because companies like Affirm harvest consumer data in more sophisticated ways to drive repeat usage.  Significantly, Chopra identified numerous ways in which the BNPL industry provides less protection for consumers than traditional banks that provide credit cards because of regulatory loopholes.

54.     Chopra stressed that BNPL providers do not provide dispute protection that credit card issuers are required to offer.  Under federal law, credit cards companies are required to assess before extending credit whether borrowers can repay their debts to avoid harmful risks of overextension.  BNPL companies like Affirm are not required to do the same.  Chopra also agreed that BNPL companies use dark patterns and adjust product prices based on consumer behavior more than credit card issuers.  According to Chopra: "this heavy reliance on data, combined with a mismatch on transparency and choice, elevates the risk of what the [R]eport describes as 'overextension.'"  Chopra emphasized the September 2022 Report's concern that BNPL providers "may have no idea how many other loans a consumer may have with other" BNPL providers.

55.     Chopra concluded his remarks by stating that it would be in the public's interest for BNPL providers like Affirm to "adhere to many of the baseline protections that Congress has already established for credit cards."  Chopra also stated that the CFPB staff had been instructed to identify BNPL providers' data surveillance practices that "may need to be curtailed," and provide options on how the BNPL industry "can develop appropriate and accurate credit reporting practices."  Finally, Chopra stated that the CFPB was considering whether BNPL providers should be required to submit to compulsory examinations like credit card companies, and instructed the CFPB staff to consider rules that regulate the industry to prevent consumer harm.

### SBPC's Report Demonstrates the Company Originated High-Risk Loans for Vulnerable Students

56.     The Student Borrower Protection Center ("SBPC") is a nonprofit organization that focuses on solutions to alleviate the burden of student debt.  It has analyzed and reported on the emergence of "Shadow Student Debt," a term for risky loans made available outside the traditional private student loan market.  The SBPC has been concerned with the exploitation of students by FinTech companies.  Increasingly, students have relied on Fintech companies for financing to pay

for predatory for-profit educational institutions.  The SBPC conducted an investigation and released a report entitled "Shadow Student Debt" on July 17, 2020.  Shadow Student Debt, STUDENT BORROWER PROTECTION CENTER, July 2020 (hereafter the "Shadow Student Debt Report").  The Shadow Student Debt Report documented that a web of predatory and largely unaccredited and for-profit schools is enabled by fintech companies to "drive students to take on billions in risky, high-cost shadow student debt." *Id.*

57.     This predatory behavior has now extended to the BNPL industry.  On March 3, 2022, the SBPC released a Report entitled "Point of Sale Fail: How a Flood of 'Buy Now, Pay Later' Student Debt is Putting Millions at Risk" (hereafter the "SBPC Report") that described how BNPL was offered as a method of payment for tuition expenses at unaccredited schools that are otherwise ineligible for federal student loans. The SBPC Report found that BNPL companies like Affirm drove students towards risky loans to pay for the cost of education at questionable for-profit schools.  In particular, the SBPC Report identified 17 instances where the Company offered financing for unaccredited, unregulated for-profit online "schools."  The Company's BNPL platform was offered as a payment option for expensive classes in midwifery, cosmetology, cybersecurity, creative writing, and other unaccredited vocational training.  The SPBC Report reported an "increasing trend of companies in [the BNPL industry] seeing lucrative opportunities in education financing."

58.     Like the CFPB, the SBPC also concluded that running soft credit checks as is typical in the BNPL industry limits the ability to make good-faith determinations about the borrower's ability to repay the loan.  This has a devastating effect on consumer credit profiles.  According the SBPC, while BNPL payments made to for-profit schools are not reported to credit bureaus, delinquencies are.

59. In describing the for-profit institutions, the SBPC Report found that the courses offered cost hundreds or thousands of dollars to attend, and BNPL financing "only heightens" the risks of default and delinquency. Meanwhile, the attraction of BNPL with soft credit checks, a feature of BNPL by design, has proven to be a temptation for consumers: studies show that 23 percent of consumers are "very" or "extremely" interested in using BNPL to finance education, and the socioeconomic group most interested in utilizing BNPL for education is living paycheck to paycheck.

60. As the SBPC's Press Release announcing its report on March 3, 2022 described: "the structure of BNPL loans means that students will likely have to begin repayment before any job or promotion that their course of study promised materializes, generating a timing mismatch that could heighten financial risk." Further, because these for-profit schools do not face public reporting requirements, students' abilities to assess representations about employment prospects are extremely limited. Further, according to the SBPC Report, the Company offered to finance courses that were particularly active in online credentialing programs for "upskilling," which have been alluring during post-Covid employment disruptions. However, such programs do not fall under any formal oversight and fail to offer proof that graduates have the career prospects that these courses advertise. As the SBPC Report stated: "these courses frequently serve as low-quality vehicles to trap borrowers in piles of unaffordable debt."

61. For example, Haircation offers financing through Affirm for a $1,450 online course teaching students about hair extensions. Made Institute offers a $13,000 online fashion design certification that can be financed through Affirm. As of the date of the SBPC Report, a student could also take a $500 "life force energy" healing certification course at the Art of Living Maui. The SBPC Report also notes that several technology upskilling for-profit institutions offer financing

through Affirm, but "there is no evidence that these courses provide any pedagogical value or produce the career outcomes to which they point."

62.     As another example, the American Fitness Professionals Association ("AFPA") offers "a wide range of professional certifications in the fields of fitness, personal training, holistic wellness, and nutrition."  On its website, it advertises that through Affirm, a student can "Pick the loan that fits your budget over 3, 6, or 12 months."  It provides that "a $950 purchase may charge 20% APR":



63.     In the fine print, however, AFPA states that the rate could go as high as 30%, and that a down payment may be required.

64.     The SBPC Report was submitted as a public comment to the CFPB on March 25, 2022, and cited in the CFPB's September 2022 Report, and was therefore known to BNPL industry participants.

**A CFPB Survey Demonstrates the BNPL**
**Industry Preys on the Working Poor**

65.     BNPL providers, including Affirm, did not provide adequate data to assess the profile of a typical BNPL borrower in conjunction with the initial investigation.  After receiving additional data, on March 2, 2023, the CFPB released a survey entitled: "Consumer Use of Buy Now Pay Later: Insights from the CFPB Making Ends Meet Survey ("CFBP Survey").[3]  This survey confirms that Affirm targets, and profits off of, the poor.

66.     According to the CFPB Survey, Defendants' repeated representations that BNPL is a substitute for traditional payment methods such as credit cards were false.  To the contrary, the

---

[3]     Available at https://www.consumerfinance.gov/data-research/research-reports/consumer-use-of-buynow-pay-later-insights-from-the-cfpb-making-ends-meet-survey/.

CFPB Survey found that BNPL users stack BNPL loans on top of traditional credit and are "[m]ore likely to borrow using credit and retail cards, personal loans, student debt, and auto loans compared to non-BNPL borrowers."  The CFPB Survey also reported that "BNPL borrowers were, on average, much more likely to be highly indebted, revolve on their credit cards, have delinquencies on traditional credit products, and use high-interest financial services such as payday, pawn, and overdraft compared to non-BNPL borrowers."  In fact, BNPL users had nearly double the credit card and retail debt compared to non-BNPL users.  *See* CFPB Survey below:



67.     The CFPB Survey also noted that Black, Hispanic, female consumers, and those with household incomes between $20,001 to $50,000 were significantly more likely to use BNPL offerings compared to white, non-Hispanic, and male consumers. The CFPB Survey further found

that those with incomes above $200,000 were the least likely demographic group to use BNPL.[4] *See* CFPB Survey below:



68.     Further, the CFPB Survey found that BNPL borrowers have lower liquidity and savings on average compared to consumers who did not use BNPL, and exhibit measures of financial distress at rates higher than non-BNPL users. 69% of surveyed BNPL borrowers carried over a credit card balance from one billing cycle to the next. This exposed the borrowers to interest rates of well over 20%. Borrowers who used BNPL were also 26 percentage points more likely to

---

[4]     The CFPB Survey said that the "lower likelihood of utilization among those with the lowest income, $20,000 and lower, may [] be attributed to supply factors such as where BNPL is advertised," or that they may have "insufficient disposable income for consumption in general," as well as a lower approval rate.

have a credit card overdraft, 12 percentage points more likely to use alternative financial services such as payday/pawn loans, and 27 percentage points more likely to have revolved on their credit card in the past billing cycle than non-BNPL users.

69.    The CFPB Survey further demonstrated that BNPL borrowers, on average, have lower average credit scores than consumers who do not use BNPL.  An average BNPL user has a subprime credit score (under 670), while a non-BNPL user has an average credit score classified as near prime (670-739):



70.    The CFPB Survey also reported that 88% of BNPL users have an open credit card, which was 13 percentage points more than non-BNPL users, and that BNPL users were more than 2.5 times as likely to be delinquent on a credit product than non-BNPL users (18% vs. 7%).

**The Interplay Between the Company's Funding Sources and Interest Rates**

71.     The Company has three funding sources. **First**, it has warehouse lending facilities with certain banks providing it capital to originate or purchase loans. These are subject to floating interest rates.  The Company's warehouse facilities mature between 2023 and 2029 and allow borrowings up to 12 months before the maturity date.  **Second**, the Company uses forward flow arrangements to sell loans to wholesale buyers such as pension funds, insurance companies and hedge funds. These arrangements allow the Company to offload the economic interest in the loan to third parties, but the Company continues to service the loans and earns revenue from this activity.

72.     **Third**, the Company bundles and resells loans through asset-backed securitizations. As the servicer of these trusts, the Company has the "power to direct the activities that most significantly affect" their economic performance. *See* 2022 Form 10-K at 128.  During the Relevant Period, more than a third of the Company's loan portfolio was funded by securitizations.

73.     From the beginning of the Relevant Period, central banks and market commentators discussed the end of the zero-rate regime that had been present during the first year of the Covid pandemic, and much of the prior decade.  Between March 2022 and March 2023, central banks around the world raised interest rates significantly in an attempt to tame inflation.  In the United States, the Federal Reserve raised the Federal Funds Rate from a target range of 0.25%-0.5% to 4.75%-5.00%.[5] These rate hikes adversely impacted all of the Company's funding sources, even though Defendants repeatedly denied or downplayed the risks.  Unable to favorably sell or securitize loans as it had in the past, the Company more than doubled the amount of loans retained on its balance sheet. The total amount of loans that the Company retains on its balance sheet has increased from $1.76 billion in the second quarter of 2021 to $3.47 billion in the second quarter of 2023.

---

[5]     The Federal Reserve's Open Markets Committee sets the Federal Funds Rate, also known as the federal funds target rate, as a range between an upper and lower rate limit, in .25% ranges.

74.     Warehouse facilities with floating rates became more expensive and yields that investors demanded for asset-backed securities over the benchmark rate began to increase.  This is evident in the securitizations that the Company arranged during the Relevant Period.  Between February 2021 and May 2022, the opening coupon rate the Company paid for its most senior tranche for an asset-backed security rose from 0.88% to 4.30% and increased to 6.61% in January 2023 for its most senior tranche.  The loans underlying these securities as well as other loans that Affirm sold through forward flow arrangements also became riskier because delinquency rates doubled from low delinquencies during the pandemic.

75.     Data collected by Morningstar, Inc., an investment research and management firm, demonstrates that the weighted average credit score of borrowers for the Company's securitizations shifted from near-prime in 2021 to near sub-prime in 2022.  According to the CFPB Survey, credit scores between 580 and 669 are considered subprime and credit scores between 669 and 739 are considered near-prime.  According to the Morningstar reports, weighted average credit scores of borrowers of the underlying loans in the Company's shorter-term securitizations declined from 686 to 690 in August 2020 and February 2021 to a range between 668 and 674 in 2022 and early 2023. These reports are not available to ordinary investors upon reasonable inquiry. Additional red flags also emerged in the Relevant Period.  In early 2022, the Company delayed a securitization solely because investors raised serious concerns about rising interest rates.   On November 4, 2022, *Bloomberg* reported that the Company abandoned a $350 million bond plan because investors demanded much higher yields than Affirm intended to pay.  According to Morningstar, the underlying assets pooled for the deal were BNPL loans.

**Defendants Were Aware Of Interest Rate Risks,
the Company's Business Metrics, Its Focus on Vulnerable
Consumers, and Predatory Practices of Merchant-Partners**

76.     Defendants' own statements concede their knowledge of the misrepresented and concealed facts.  Throughout the Relevant Period, Defendants promoted their access to granular data about predatory practices designed to overextend customers, harvesting of data to create consumer profiles, interest rate risk and credit risk in SEC filings as well as commentary during public events. For instance, on March 10, 2021, Defendant Linford attended the Truist Securities Technology, Internet & Services Conference.  At this event, Defendant Linford promoted the Company's models for assessing credit risk as superior to the Company's competitors and stated that "we're always ingesting more data and more signal into the model and training it on more transactions and more consumers."  On an earnings conference call held on May 10, 2021, Defendant Levchin made similar claims when he bragged about the Company's "proprietary machine learning," an application of artificial intelligence tools, to support the assertion that "we're able to personalize offers for consumers, more efficiently at proven price credit, and manage risk in ways that achieve better credit outcomes."

77.     On September 28, 2021, the Company held an Investor Forum where Michalek, the Company's President of Technology, Risk and Operations, confirmed that the Company collects granular data on borrowers related to shopping, payments and purchasing power down to the stock keeping unit level in an effort to drive repeat usage. On November 17, 2021, at the Citi 11th Virtual FinTech Conference, Defendant Linford went further when he disparaged the risk assessment tools of traditional financial institutions and the Company's competitors to claim that the Company's machine learning capabilities "can accurately predict for pools of consumers [what] losses are going to be, and we can price relationships with merchants and consumers and a lot of that risk that we're

taking." These kinds of statements were not about underwriting quality in the aggregate. At a February 10, 2022 earnings conference call, Defendant Levchin specified that tools like this allowed the Company to model each individual borrower's ability to pay down to an individual transaction, allowing the Company to "deliver a reliable forward-looking picture of both consumers and our own cash flow."

78.     At an earnings conference call held on May 12, 2022, Defendant Levchin confirmed that credit performance and borrower profiles were monitored at the highest levels of the Company, including the head of risk together with the executive team, when he said that "[i]t's not a thing we sort of get together and say, all right, it's been a quarter, let's talk about it. Like we talk about it literally every Monday morning . . . and we review all our numbers, and say, hey, how do we feel about the American consumer at the highest level?" Thus, Defendants were aware of or recklessly ignored granular information showing that BNPL loans drove borrowers to become overextended.

79.     Defendants' assertions were not limited to monitoring creditworthiness in the abstract or limited to surveillance of borrower data. In the 2022 Form 10-K, the Company represented that it monitored "merchants' creditworthiness, consumer complaints and dispute rates, changes in consumer repayment behavior, and other data to give consumers the confidence that merchants integrated with Affirm are committed to delivering honest and delightful experiences." The Company was thus aware of predatory merchants, including unaccredited and/or for-profit online "schools" like Haircation and Made Institute.

80.     Defendant Levchin also boasted in November 2021 that the Company had hired individuals from "key supervising regulators" like the CFPB to join its legal and compliance team, providing Defendants insight into the CFPB's regulatory process. Defendants knew or recklessly ignored that the CFPB did not approve of its predatory BNPL practices.

81.     On September 15, 2022, Defendant Linford mischaracterized the CFPB's September 2022 Report, stating "we've solved all these problems already," without providing any specifics, acknowledged the CFPB's concerns about loan stacking and "lack of reporting," but asserted that "we're heavily invested in trying to get that right for the whole space" without providing any proof. Regardless, Defendant Linford's acknowledgment about overextension risks and his claim that Affirm was invested in "trying to get that right" admits knowledge that these practices were a major problem if not resolved.

82.     Other representations were made that demonstrate access to information or knowledge or reckless disregard for the risk of rising interest rates and their negative impact on the Company's funding costs.  Defendant Linford spoke with a great degree of specificity on this topic throughout the Relevant Period.  For instance, Defendant Linford assuaged investors' rate fears just after United States Secretary of the Treasury Janet Yellen warned in early 2021 that interest rates would soon need to increase.  On May 11, 2021, Defendant Linford attended the MoffettNathanson Payments, Processors, and IT Services Summit. At this conference call, Defendant Linford was asked about how an increase in interest rates would affect the Company's business, and Defendant Linford responded that Affirm had stress tested its revenue model and, based on the results of those tests, the Company was "well positioned to succeed in any rate environment that we've seen over the past 20 years." He further stated that:

> We believe there's a real misconception about interest rates in Affirm out there right now.  **We believe that we're really well positioned to succeed in any rate environment that we've seen over the past 20 years.**
>
> There -- **we have gone back and stress tested our model, business model, revenue model, the level of what we call contribution profit or revenue less transaction cost, we've gone back 20 years of rates and stimulated it through our business and we're good, which means we can get it for like 650 basis points of rates.**

And like while we believe that like everybody that rates won't stay at zero forever and that we are going to have to start reacting to a higher rate environment, we think the first derivative, i.e., the change in rates it just doesn't impact us. *Seventy-five percent of our portfolio is funded with fixed rate or no polluting -- no interest rate exposure at all and the 25% that's funded with interest rates, but that we're in complete control over. So, in the short-term kind of first derivatives shocks doesn't worry us at all. And longer term we can go back over two decades and still be good with respect to our unit economics and that's before we pull any of our cost or revenue levers, which are huge.*

So, on the revenue side, look, the higher the break the more valuable a 0% offer is. It's just definitional, right? If you're a consumer -- if you're a consumer and rates are 0, a 0% offer is less compelling as when the rates are at 3%, 4% or 5%.So we know that the product is more valuable and how we monetize it is a thing that we can do either through the merchant, which we tested during COVID where we had to tighten credit and our product was valuable enough that merchants chose to continue to pay us more merchant fees to support the same level of approvals. *And we think the same will hold out in a higher rate environment.*  [Emphasis added].

83.     The Federal Funds Rate was over 5% between 2006 and 2007.  It has not come close to "650 basis points."[6]  Given Defendant Linford's affirmative about stress test results over a 20-year period, and his repeated assurances that there would be little to no short-term impact on Affirm from an increase in interest rates, the Company's funding costs should not have unexpectedly increased, as the Company ultimately admitted they would when it announced disastrous financial results for the second quarter of 2023 on February 8, 2023.  Funding costs did, in fact, increase within weeks of Linford's misrepresentation that the short-term risk was minimal because of an increase in interest rates as Defendants ultimately admitted, reducing RLTC as a percentage of GMV, a metric that Defendants repeatedly emphasized as key to the Company's success.

84.     On May 25, 2022, Defendant Levchin attended the JP Morgan Global Technology, Media & Communications Conference.  At this event, Defendant Levchin was specifically asked by

---

[6]     "Basis point" refers to 1/100th of a percent. 650 basis points as used above refers to 6.5%. *See* https://www.investopedia.com/terms/b/basispoint.asp.

an analyst whether any forward flow partners could pull back, and he responded: "we watch the numbers like hawks to make sure that we are never on the wrong side of any deal – and I think in rougher or more complicated times, which is certainty where we are now.  These partnerships are tested, but people also flight to quality.  Like there's a real sense that I've got several conversations that I've had with our funding partners that they don't just love our assets that they always have, they expect us to be one of the partners that they rely on to place more capital."

85.    Similarly, on June 14, 2022, Defendant Linford attended a Fireside Chat hosted by Autonomous Research LLP.  This event took place less than eight months before the Company announced poor financial results in February 2023 and conceded that a rise in funding costs due to increased interest rates would impair its performance.  At this event, Defendant Linford talked at length about how the Company had onboarded funding "all the way through May 2024," had a few deals with "episodic pricing renewals," but assured the market that "there's not a lot of short-term rate exposure to the business.  We have a lot of certainty in the next 6 or 12 months on where things would be."  He further stated that the Company had "thought about this a lot," was "very careful on protecting the profit in the loan," built funding capacity "for the future at all times," and minimized "volatility" in the macroeconomic environment because "there's a lot less short-term exposure."

86.    On August 25, 2022, the Company held an earnings conference call to discuss the financial results for the fourth quarter of 2022 where Defendant Linford continued to provide assurances about the Company's ability to mitigate the risk of a continued rise in interest rates on the grounds that 95% of forward flow capacity was already locked in and did not need to be renewed, and specifically represented that the risk of "higher cost of funds" or the chance of lower yields on loans sales would be "delayed," *i.e.*, the problems did not impact the Company in the short run.

**Confidential Witnesses ("CWs")**

87.    CW1[7] worked at the Company from March 2019 to August 2022 out of the Company's New York office and remotely.  CW1 reported to the Company's Chief Capital Officers Geoffrey Kott and later Brooke Major-Reid ("Major-Reid").  CW1 first joined the Company in March 2019 as an Associate in Capital Markets, and in March 2020, was promoted to Senior Associate in Capital Markets, then promoted again to Lead, Capital Strategy in October 2020, and then became the Manager in Capital Strategy in January 2022.

88.    CW1 worked with the Company's Treasury department and helped manage the Company's relationships with originating banks.  CW1 had direct experience with transactions such as debt facilities, loans sales and asset-backed securities.  According to CW1, the Company delayed a $500 million revolving, asset-backed security in March 2022 for reasons purely related to the interest rate risk.  CW1 knew this because CW1 met with Major-Reid, and the syndicate desk of Barclays, which is an intermediary between the private and public side of the bank that facilitates sales of asset-backed securities.  At this meeting, CW1 asserts that the discussion focused on the cost of funding because of interest rate volatility.

89.    CW1 recalled that investors with larger orders reneged because the coupon rates offered were not high enough in light of the risk that interest rates would rise. According to CW1, the message delivered by the Company's counterparties was that the orders were only good if Affirm significantly increased its costs of funds to them.

90.    According to CW1, Defendant Linford knew about this meeting and was closely involved in the decision-making process because Major-Reid sent Defendant Linford "play-by-play"

---

[7]    All citations to CWs are found in the securities class action entitled *In re Affirm Holdings, Inc. Sec. Litig.*, Case No. 3:22-cv-07770-WHO (N.D. Cal.) ("Securities Class Action") and are based upon information and belief.

text messages about the meeting, and she would have also updated Defendant Levchin.  CW1 also confirms that Defendant Linford has detailed knowledge of these issues because Linford meets with the Company's banking partners regularly.

91.     CW2 worked at the Company from January 2020 to February 2023 as a Compliance Program Manager and as a Compliance Manager, Financial Crimes.  CW2 reported to Chanell Bruno, the Senior Compliance Manager and Head of Know Your Customer, Anti-Bribery and Financial Crimes Oversight and Governance.  CW2 stated that Defendant Levchin and other senior leaders discussed the CFPB inquiry during Company-wide all-hands meetings. CW2 also explained that the Company kept information regarding the specifics of the CFPB inquiry at a really high level of management.  CW2 further states that the CFPB investigation was still considered an ongoing matter at the Company when CW2 left the Company in February 2023.

92.     CW3 worked at the Company from October 2021 to October 2022 as a Senior Associate in the Capital Markets group.  CW3 was based in the Company's New York office.  CW3 reported to the Vice President and Global Head of Capital Markets Ryan Foss, who reported to Chief Capital Officer Major-Reid.  CW3 worked on securitizations, including the $500 million sale of asset-backed securities that the Company delayed in March 2022.  CW3 stated that most of CW3's team did not believe the Company's public statements concerning the minimal impact from rising interest rates.

93.     CW3 also corroborated a key issue addressed in the CFPB's September 2022 Report, confirming that the Company delayed refunds for purchases subject to returns or disputes like the other four BNPL providers.  Until 2022, the Company did not issue refunds unless merchants approved them first after an investigation.  After receiving customer complaints, the Company changed its refund policy in 2022, and paused additional interest in cases where a transaction was in

dispute. Moreover, according to CW3, it was understood internally at the Company that the best case scenario for the Company was increased regulatory scrutiny as a result of the CFPB's ongoing investigation into BNPL providers.

## FALSE AND MISLEADING STATEMENTS

94.     On February 11, 2021, the Company held an earnings conference call to discuss the Company's fiscal year 2021 second quarter results.  During the call, Defendant Levchin made the following misleading statements regarding the Company's BNPL offerings:

**Max Levchin**

\*\*\*

*Affirm was founded almost a decade ago with the mission to build honest financial products that improve lives*.  We knew that consumers were tired of the constant penalties like late fees and deferred interest from credit cards, and we knew that merchants needed new payment solutions that could help them attract and retain customers while avoiding discounts and promotional gimmicks which can dilute their brands and their bottom lines.

*Since the beginning, we focused on building a new kind of payment network, the first to align its own success with the success of both consumers and merchants. Affirm [wins] when our consumers and our merchant partners win.*

\*\*\*

95.     The statements identified above were false and misleading when made because they omitted to disclose that (a) the Company's BNPL offerings increased the risk of consumer harm because, among other things, the Company (i) harvests consumer data, creates roadblocks towards a resolution of disputes with customers, overextends credit through loan stacking and sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor, and as a result (b) the

Company's BNPL offerings are not "honest," do not "improve lives," and the Company's economic

interests are not "aligned" with the interests of consumers.

96.     On the same call, Defendant Levchin made the following misrepresentation about the

Company being unique in "speak[ing] to the end consumer truthfully" when asked what

differentiates the Company from its competitors:

**Q- Andrew Jeffrey**

Hi. Good afternoon. Appreciate you taking the question. Max, maybe I'll build a little
bit off Brian's question from a competitive perspective. There are a number of
players in the market, ***can you elaborate on why you think Affirm wins?*** And
particularly, what differentiates Affirm from peers? I mean, you're not really doing
Pay in 4, per se. Today it's a much more complex model. And I wonder if you could
just speak a little bit about ***why you think you have a competitive advantage?*** And
maybe why Affirm is uniquely positioned to take big share exclusivity with
platforms like Shopify notwithstanding?

**A- Max Levchin**

*** 

The other one which I feel never gets enough fair play and so I'll just keep on
repeating it.   ***We're the only ones in the space that actually speaks to the end
consumer truthfully. We don't charge late fees. We don't do deferred interest. We
don't do any other things that ultimately disburse somewhere between rolling their
eyes at and just get very, very angry about it.*** And consumer brand love is important
to us and it's very important to merchants, but fundamentally what drives will be a
transaction.  So we are very keen on continuing down that line as well because
ultimately, merchants and merchant platforms want to partner with brands that add to
their own brand love as opposed to potential embarrassment. ***And that's something
that we feel very strongly about and we continue to wish the industry would change
and follow our lead. But for the moment, we are unique in that sense and we take
great pride in that with continue winning deals because of that point of view.***

97.     The statements identified above were misleading when made because Defendant

Levchin omitted to disclose that (a) the Company's BNPL offerings increased the risk of consumer

harm because, among other things, the Company (i) harvests consumer data, creates roadblocks

towards a resolution of disputes with customers, overextends credit through loan stacking and

sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor, and as a result, the Company (b) did not speak to customers truthfully, (c) consumer harm was and is not limited to late fees or deferred interest as the CFPB's findings make clear in the September 2022 Report, and (d) like all its competitors, the Company's BNPL offerings carry serious risks of consumer harm, rendering Defendant Levchin's repetitive statements concerning the absence of late fees or deferred interest misleading.

98.     On March 1, 2021, Defendants Linford and Levchin spoke at a Virtual Morgan Stanley Technology, Media, and Telecom Conference.  At this event, Defendant Levchin made the following misleading statements regarding the Company's "transparency," in response to an opening question about the basics of what Affirm offers to consumers and merchants:

**Q- James Faucette**

So without really any further ado, Max, why don't we start with you, for those maybe that are less than they are familiar with Affirm or at least the business intricacies themselves, can you talk a little bit about the main solutions Affirm offers both merchants and consumers?

**A- Max Levchin**

\*\*\*

*And what if we built a company that provides the same point of sale financing solutions, but fundamentally aligns itself to the success of the borrower*, as well as the merchant and help merchants close more transactions, potentially higher ticket, *while giving consumers total and full transparency to exactly what they're going to pay and whether there's any interest at all or not, they should know precisely what that number is in dollars, not some esoteric measures.*

That's what we built out. At this point, we are on 1000s of brands online and offline and have served multiple millions of consumers transacting. *We have maintained the*

*extraordinary high net promoter score primarily by just sticking to this idea of total transparency and extreme clarity in customer.   We've never charged a penny of late fees.* My favorite statistics, we don't do deferred interest, we don't do really anything consumers can't expect.   *We go to great extent to great pains to make sure that consumers love us and not just sort of like, "Oh, yes, that was nice," but actually think of us as a great financial partner to them.*

99.     The statements identified above were false and misleading when made because they omitted to disclose that (a) the Company's BNPL offerings increased the risk of consumer harm because, among other things, the Company (i) harvests consumer data, creates roadblocks towards a resolution of disputes with customers, overextends credit through loan stacking and sustained usage and fails to properly vet customers' ability to pay as credit card companies are required to do so under federal law, (ii) allows its platform to be used by predatory for-profit unaccredited "schools," (iii) uses deceptive devices like dark patterns that drive up repeat usage as well as loan stacking and (iii) profits from its BNPL offerings by preying on the working poor.   For these reasons, the Company is not "fully transparent" or "aligned" with borrower "success" as Defendant Levchin incorrectly represented and was not a "great financial partner" to the vulnerable consumers it purported to serve.   Further, touting the net promoter score created an affirmative duty to disclose the adverse facts identified in this paragraph.

100.     On May 10, 2021, the Company held its earnings call to announce its second quarter fiscal year 2021 results.   On this conference call, Defendant Levchin boasted about the Company's "core values" and that Defendants "put [the customer's] interest before our own":

**Max Levchin**

Welcome everyone and thanks for joining us on today's call. We were excited to update you on the performance of our business and the progress we achieved since our call in February.  But before we go through the numbers, I would like to start by sharing a few stories from the past quarter to help demonstrate the power of Affirm.

*As many of you know, at Affirm, one of our core values is that people come first. That means that we constantly consider our impact on people's lives, and we strive*

*to put their interest before our own.* That's why we never charge late or hidden fees. It's also why we're always looking at what consumers have to say about us, and how we're helping them, get the things they want and need.

*** 

101.    The statements identified above were false and misleading when made because the Company did not put consumer interest before its own interest, and the statements omitted to disclose the facts identified in paragraph 99.

102.    On May 11, 2021, Defendant Linford spoke at a Moffet Nathanson Payments, Processors, and IT Services Summit.  In response to an analyst's question about regulatory oversight, Defendant Linford made the following false and misleading statement:

**Q- Analyst**

All right, well you mentioned in there a little bit -- some of -- I wanted to talk a little bit -- I guess, maybe follow on to the credit risk management is related to how you think about regulatory oversight. I know this is a controversy when it comes to this whole space because it's a little bit unclear country to country exactly how the regulators are going to lean in.

So I guess, one specific topic raised in a question here and also came up in our earlier session is just how you think about potential requirements to report to the bureaus. So I know right now some tranches, some portions, at least, of the NPL payments -- or that consumers are taking do not end up being reported into the bureau, so they don't show up on a typical credit. And so, like, how do you think about the impact of that on your business, like, if that became a requirement or not or what's your perspective on that dynamic?

**A- Michael Linford**

***Yes, I think the most important thing is that the playing field is level.*** So from our standpoint, in our higher average order value product we both furnish and benefit from the bureaus. We do it a little bit different.

It's important that -- a traditional FICO is not favorable to -- in some [ph] loans generally. And so there's some nuance around how that furnishing happens. But we actually think that the furnishing system is important and we think it's a good thing, we also think it's not entirely appropriate for certain transaction types, right. So it seems to us a little out of place to furnish on a $50 transaction.

> *But the most important thing for us is just that the playing field is level and that the rules are understood. And that applies to the regulatory context as well. I think the thing that benefits us in that conversation is that we do put consumers first.*

***

103.    The statements identified above were misleading when made because (a) the "playing field [was] not level," as CFPB Director Chopra made clear, but rather the Company and its BNPL peers provided inferior consumer protections compared to some legacy payment options, and (b) the Company did not "put consumers first," but instead manipulated them to generate sales for the merchant-partners for which it considered itself a "marketing tool."

104.    On September 9, 2021, the Company held an earnings call to discuss its fiscal year 2021 fourth quarter results. During the scripted portion of that call, Defendant Levchin made the following false and misleading statements about the Company's supposedly more "honest financial product[]":

**Max Levchin**

Welcome everyone, and thank you for joining us on today's call. Before we get into the results, I want to start by talking about what we're actually building at Affirm. *Around 10 years ago, we founded Affirm with a simple mission, to deliver honest financial products that improve lives. We started by reinventing payment to make them transparent, simpler, smarter, and more delightful. Our core insight was that the generations coming of age after the financial crisis of 2008 were no longer willing to tolerate getting into permanent debt by putting it all on the card or getting burned by late fees and deferred interest.*

*These young consumers and many like-minded older ones grew fundamentally suspicious of credit and retreated into the simplicity of their debit cards. This created no less than a once-in-a-generation opportunity to transform credit. And thus, began the great unbundling of the credit card.* The credit card was the ultimate buying bundle, a single product allowing you to put purchases of all sizes together in one basket with the freedom to pay for them later. *Unfortunately, if you couldn't pay for them later and in full, endless debt became nearly inevitable and that credit card could quickly become the financial equivalent of a ball and chain. That where Affirm came in.*

*We deconstructed -- rather, we unbundled the credit card, starting with the largest purchases.  We made these easier more transparent and helped consumers be smarter about buying now and paying later.* In order to do all of this, we built proprietary technology from the ground up and developed sophisticated capital markets expertise. *Our game plan was always simple, obsessed over consumer happiness, and use superior tech to give more people confidence to buy without resorting to the kind of dirty tricks the credit card industry is infamous for, late fees, fine print, deferred interest, to name a few.*

\*\*\*

105.    The statements identified above were materially false and misleading when made because the Company and other BNPL providers (a) also engage in "dirty tricks" like the use of dark patterns to drive up debt, (b) offer credit products that provide less protection than those afforded to credit cardholders as Director Chopra explained in his public remarks, and (c) also carry risks of driving up "permanent debt" through loan stacking and sustained usage.

106.    On September 28, 2021, the Company held an Investor Forum.  During the question and answer session, Defendant Levchin gave the following misleading statement about the Company's relationships with regulators:

**Q- Jason Kupferberg**

Good afternoon, guys. Thanks for all the details today. We appreciate it. Wanted to see if you could spend a minute, just giving us your latest views on the regulatory backdrop as the buy-now-pay-later space continues to obviously expand in popularity. Certainly, there have been some media reports from time-to-time about some consumers getting themselves into a bit of trouble, which may certainly be a one-off situation. But, the fact that this may get more attention as the industry continues to experience significant growth. And I know, you've been proactive with the regulators in general. But we love to get your perspective and how that perspective may evolve as you take your business overseas?

**A- Max Levchin**

Great question. So first of all, for the avoidance of doubt, not only we have been – have we been engaged with a variety of regulators over the years. We are a very regulated business. We see regulatory attention through our bank partners, we speak directly to state regulator. So, we have a full complement of regulatory relationships that we need to be very attentive to and are.

Two, I think I speak for the entire team, but I'm certainly personally generally fairly proregulation when it comes to these new financial products because in the business we're in, unless you see some degree of coordination among players, even violent competitors that want to edge each other out in the market*, you want to make sure that consumers and merchants aren't inadvertent victims there.* And so, what that means is you have to standardize around the way of communicating, what is and isn't offered in a product and the way you reported to authorities, to credit bureaus, if that's part of the offering, et cetera.

And so generally speaking, I think regulatory attention is a positive thing so long as it is rooted in understanding of the product, understanding of what the intent is, et cetera. And so, all of that is why we engage with the regulators. That's why I spent several years on the CAB's Advisory Board specifically to make sure that we have a chance to communicate our value proposition. *We tend to think of ourselves as sort of the one honest actor in the space having chosen from the very beginning to charge no fees of any kind including not even late fees. The reason for it is as much about creating a unique brand and unique value proposition to the consumers, but also to frankly align our incentives, the consumers and the regulators.*

And ultimately when a regulator says, all right, so what percentage of your profits come from the fact that consumers just forgot to pay your bill is like zero. If someone forgets to pay their bill, my number one incentive to say, please pay your bill on time because I'm losing money as a result and there's nothing I can do about it other than remind you a few more times. And I think that direct connectivity with person's well-being and the regulatory intent has served us really, really well and grounded our regulatory conversations just the right way for many years now. I think the industry frankly could use some of that. *And so, I would love for my competitors, both tiny and huge to join the idea of no late fees, get rid of that terrible thing called deferred interest once and for all, which, if there's one thing I'm passionate against, it's deferred interest and many other gimmicks that the industry is infamous for.* So I partners of boxing, but it would be some welcome attention in those areas.

107.    The statements identified above were materially false and misleading when made because the Company creates many "victims" as found by both the CFPB's September 2022 Report and the SBPC's Report, and deploys "many other gimmicks that the industry is infamous for" such as the use of dark patterns and virtual malls to drive up debt, and as a result, the Company is "not the one honest actor in the space" with "incentives" "aligned" with either consumers or regulators.

108.    On February 10, 2022, the Company held an earnings call to discuss its fiscal year 2022 second quarter results.  In response to an analyst's question, Levchin made the following misleading statements about the CFPB's announced investigation into the BNPL industry:

**Q- Andrew Bauch**

Hey guys. I wanted to ask a question about the CFPB, look at buy-now-pay-later. And from whatever you can share, is there anything you've garnered from those initial discussions that kind of give us a sense of how they're looking at the offering going forward?

**A- Max Levchin**

First of all, it's obviously not for us to comment on their work there. ***The thing that's been true for us over the last 10 years is that we had a very, very high moral ground approach to this entire business to the way we conduct ourselves to the way we treat consumers, the way we deal with disputes, et cetera, et cetera.***

*** 

109.    The statements identified above were false and misleading when made because the Company (a) deprived consumers of the freedom of agency by forcing them to pay for BNPL installments while disputes about returns with merchants remained pending as the CFPB's September 2022 Report found and as CW3 confirms, and as a result (b) Defendants did not demonstrate "a very, very high moral ground approach to this entire business."

110.    On May 25, 2022, Defendant Levchin spoke at a JP Morgan Global Technology, Media and Communications Conference.  In response to an opening question about why he founded the Company, Defendant Levchin made the following misleading statements:

**Q- Reginald Smith**

Listen. So I wanted to start -- I think people have a sense of the story, but it's always good to hear like why you founded the company and how you are different than kind of traditional credit card companies.  So I'll start there and let you kind of talk and...

**A- Max Levchin**

\*\*\*

Sure. So I think credit cards are the single best user interface ever created, like the – just swiping a card, chipping it, whatever you do, is an amazing user interface. It has not been surpassed in my -- certainly, in my 30 years of doing payment products. The underlying financial product is just not good for consumers. It might be even bad it by and large, but I'll stop at consumer finance. ***People don't understand how they work for a lot of banks, present company excluded, of course. The fine print has become the business model. They literally hide various fees and tricks like deferred interest in the fine print, hoping the consumer will get tripped up. So you're literally betting on your customers screwing up to make more money. I think that's just a bad thing for consumers.***

***The way disruption works is you find an opportunity where someone has made it their business to not do the right thing by their customer and you show up with a better product, but you also align yourself with that customer interest. So on the consumer side, it's very clear, you should just do better than what a lot of credit card products have done.***

\*\*\*

111.    The statements identified above were false and misleading when made because they omitted to disclose that the Company (a) also bets on the consumer "screwing up" to make money as detailed in both the CFPB's September 2022 Report and the SBPC Report, (b) has interests that are misaligned with the interests of consumers, and (c) denied consumers even the level of protection afforded to credit cardholders as Director Chopra explained in his public remarks when the CFPB's September 2022 Report was released.

**Misleading Statements Regarding the
the Risk of Rising Interest Rates on Affirm**

112.    On March 1, 2021, Defendant Linford spoke at the Virtual Morgan Stanley Technology, Media, and Telecom Conference. In response to a question about the tightening credit market, Defendant Linford made the following misleading statements about the Company's sensitivity to interest rate increases:

**Q- James Faucette**

Got it. And last topic then maybe we'll start with you, Michael, interest rates, there's been lots of conversation about where interest rates are going. Obviously, it's been reflected in part in Affirm's stock itself. We know that as you were -- as we were entering the lockdown from the pandemic, Affirm itself kind of tightened the credit box.

So, what is your sense of Affirm's sensitivity to interest rates and how does it affect your offerings whether it be 0% or fees you generation, like how are you thinking the changing rate environment.

**A- Michael Linford**

First and most importantly, we're risk managers at heart and that applies to how we think about credit but also also how we think about interest rates. ***And so, we tend to manage interest rate risk pretty carefully inside the business from a short-term standpoint.***

***Our securitizations are fixed rate securitizations and forward flow relationships tend to have either some sort of a hedging applied to it or negotiated a process where we can manage any of the shocks that may happen. And so, we're less concerned about short term volatility in rates.***

***Longer term, we liked where our business was at pre-COVID, think about that kind of rate environment, business was very good, very healthy, margins were quite strong and we feel pretty good*** about what that would look like if we envisioned a world that had substantially higher rates, you're talking 6%-7% benchmark rates. There would start to be an impact.

113.    The statements identified above were materially false and misleading when made because (a) the Company did not manage interest rate risk "carefully," given the Company's sudden disclosure of a severely negative impact because of increased interest rates within weeks of Linford's repeated misrepresentation that there was little to no short term risk, (b) the Company's forward flow arrangements were not "hedged" to absorb "any of the shocks that may happen," and (c) the Company was not protected from past rate environments.

114.    On February 10, 2022, the Company held an earnings call to discuss its fiscal year 2022 second quarter results. During this conference call, Defendants Levchin and Linford made the

46

following misleading statements regarding the Company's business behind the backdrop of a rising

interest rate environment:

### Q- Andrew Bauch

Helpful. Thank you. My follow-up would be, is there any kind of guidepost that you're going to give us from a macro perspective, what you're embedding in the outlook for unemployment, inflation and rates. And I appreciate the color on the interest rate moves to the impact of the model, but just kind of thinking about what a baseline number that you're embedding in your assumption would be?

*** 

### A- Max Levchin

Sorry, I'll just comment (inaudible) the last one was yours. But -- and I'm sure we'll have macro views as well. ***But just the thing that I think people really misunderstand about our products, maybe because it is more popular outside of high finance perhaps, when the interest rates go up and the prices go up really, and prices go up, our product is more useful. If you try to make ends meet and you're trying to pay for a couch and your credit card is confusing you and the rates just went up and Affirm gives you clarity and a way to pay for things in a clear schedule and then you're done and there are no late fees.***

***And half the time, plus or minus, the seller will sponsor any pay your [ph] interest. Just (inaudible) experiments. If the card rate that you paid went up 5%, for example, how do you feel about the 0% rate that a seller at a homeware shop is offering you, powered by Affirm, it's 5% more compelling. And so as inflation happens, the product that we provide is actually more powerful, more useful, has significantly better bearing and sort of consumer demand side of it.*** On the flipside of course, the government addresses inflation raises rates, et cetera. I'll stop now and Michael can tell you what we've done about it, but these things get equal at that top line, this is generally a tailwind, not a headwind.

*** 

### A- Michael Linford

Yeah. Just with the total avoidance of doubt, all of our outlook reflects the forward curve. And so there is roughly 180 basis points of rate increases. We take that into all of our models when we give guidance. It's consistent with the market expectation of rate movement. ***And so talk about rising rates, that's not a problem for us at all, that's already reflected in the guidance.***

115.    The statements identified above were false and misleading when made because (a) rising rates were a problem for the Company, (b) rising rates were not "already reflected in the guidance," (c) the Company could not benefit from 0% offerings in a rising rate environment when its business had already started to shift towards interest-bearing loans, and (d) Defendant Levchin's attempt to contrast the Company's offerings with credit cards was extremely misleading given that even credit card issuers are required to provide certain protections that Affirm does not.

116.    On March 18, 2022, Defendant Linford participated in a "CFO Fireside Chat" with analyst Ramsey El-Assal from Barclays.  In response to a specific question about the Company's delayed ABS deal, Linford made the following false statements:

**Q- Ramsey El-Assal**

I want to -- I have another question on the outlook, actually. But first, I wanted to ask you about some news reports recently that Affirm temporarily put a refinancing of ABS, or an asset-backed securitization, on hold. Since then, we've also seen some other companies, I think Tesla and others delay in ABS as well. Can you talk about Affirm's funding model?

And I guess for listers, can you briefly touch on the difference between the debt you use to fund the loans you provide to consumers or funding debt and the company's own corporate debt? Even to make the question a little bit more complex, how do you plan to utilize each of the 3 different programs within your funding model going forward?

**A- Michael Linford**

                                    ***

Well the ABS market is the most directly exposed to the conditions of the market. Those investors are positioned usually to price uncertainty in its premium and so a lot of companies like ours, right now, who decided that this is not the best time to price a deal or doing so because they don't need it. It's our view that companies who need to do a transaction right now are forcing it through at economics that probably means they're paying a premium for this volatility.

We don't feel like we need to because we had better funding opportunities away. What's really important, though, is we could have transacted, we believe, and could have done so at margins that were great for the business. But that would be silly to do

in a world where we have better opportunities to fund the business with forward flow or bilateral agreement.

We remain very confident in the ABS market for us over the medium term, and we're committed to continuing to issue across all of our programs. ***When we talk to the ABS investors, it's quite stark difference between how an ABS investor, these people who buy these kind of securitizations, how they view our decision versus, I think some of the equity market reaction, and there's just the biggest connect. I think the right read of it is that companies who choose to defer a deal are doing so because they have strength, and that's exactly what happened with us.***

117.    The statements identified above were materially false when made because (a) as CW1 confirms, the ABS deal that Defendant Linford discussed was delayed not because of strength but solely because of interest rate risk and investors' demand for higher yields, (b) the statements omitted to disclose that the delayed deal was a red flag that made Linford aware that his statements had the danger of misleading investors, and (c) both equity investors and ABS investors were equally concerned about rising interest rates.

118.    On May 12, 2022, the Company held an earnings call to discuss its fiscal year 2022 third quarter results. In response to a specific analyst question about how the Company managed risks from rising interest rates, Defendant Linford made the following misleading statements dismissing such concerns:

**Q- Moshe Orenbuch**

Got it. Thanks. And as a follow-up question, Michael. One of the questions that we get most often from investors is, in the face of a rising rate environment, obviously, you have some products where the consumer is the primary one that's been charged and that's merchants -- charge to the merchant particularly the zero percent category. Could you talk a little bit about your plans as to how to kind of manage the rising interest rate environment for each of those products, and maybe what you've also done to-date if anything?

**A- Michael Linford**

Yes. We really haven't had to take any action today. If you look at the merchant fee rate slide in our supplement, you'll see again relatively constant merchant fees. We view that as a real mark of success in the face of pretty heavy competition we're able

to maintain and even grow in some cases, the emergency side. And of course, as we talk a lot about on the APR side and the consumer side, those rates are strong enough to allow us to deliver really compelling unit economics, and that's the lens through which we look at, at this question.

***And it is true that as rates go up, there is pressure on the funding side of our business, but it is a mistake to think about that as a full flow through on a linear basis. We have many different funding channels with staggered maturities and very different structures. And as I mentioned, for example, we just onboarded a new forward-flow partner, who's an insurance company, has a very different view of rates and how they think about that versus a access to quality assets over time. That allows us to manage it in the nearer term. I think in the very long run, so going out more than a year, you would expect us to need to start to take action, but that's more of a long-term thing than anything we deal with tactically in the near-term.***

119.    The statements identified above were materially false and misleading when made because they omitted to disclose that (a) the Company's business was highly exposed to short-term risks from an increase in rates and, did in fact, suffer from a negative, short-term impact, (b) the Company's funding sources were not immune to rate increases, and (c) the Company's exposure to rising rates was increasing and was something that the Company needed "to deal with tactically in the near term."

120.    On May 25, 2022, Defendant Levchin spoke at the JP Morgan Global Technology, Media and Communications Conference.  In response to a question about funding in a rising interest rate environment, Defendant Levchin made the following misleading statements:

**Q- Reginald Smith**

Understood. So just thinking about your portfolio today and I don't have the stat in front of me of what proportion is held on balance sheet. The question is, do you anticipate that changing? Are you -- is your appetite to hold more, increasing?

Then the second part of that question is with rates rising and there being presumably more options for your forward flow partners to invest in different things, has that changed their appetite or willingness or eagerness to use? Because my sense is that when rates were rock bottom that these folks have money to put to work and didn't have any place to put it and so...

50

**A- Max Levchin**

***

*In terms of rates, we've been in business for a long time, and we ran the company just fine back when the rates were not a bottom, and we had 1 full relationships. We cultivated them and did really well for our partners back then, and we'll continue to do so now.*

*Three, as we grow larger and become a more reliable simply through just having more and more quarters reported, partner on the debt side, the doors to deeper pools of capital that are less rate sensitive, but more -- had lots more capital to deploy are open to us.* 5 years ago, going to an insurance company or a pension fund, it was sort of like probably, we're probably going to get laughed out of the room, like we're just too new. And at the time, I was like, we're five years in, how can we be too new. *We're no start-up. So it's now over 10 years, and these doors are open to us, and we are adding insurance companies and pension funds.* I think those folks are certainly looking for yield. But more than anything, I think they look for stability and great partnerships. That's what we have become known to bring.

121.     The statements identified above were materially misleading when made because the Company's access "to deeper pools of capital that are less rate sensitive" could not, and did not, mitigate the risks of rising interest rates as Levchin misstated.  Further, Levchin's statements were misleading because the Company's financial performance deteriorated despite benchmark rates being lower than in certain times during the preceding 10 years that Levchin referenced.

122.     On September 15, 2022, Defendant Linford spoke at the Autonomous Research Virtual Annual Future of Commerce Symposium.  In response to a question about the Company's RLTC metric, Defendant Linford made the following false and misleading statements about the Company's ability to achieve strong profit margins in a high interest rate environment:

**Q- Robert Wildhack**

Got it. Okay. Let's actually jump right to profitability and talk a little bit about revenue less transaction costs, the outlook there for this coming fiscal year points to RLTC as a percentage of volume, like 3.7% at the midpoint. To start, what are the moving parts between that and the 4.3% you reported last year?

**A- Michael Linford**

51

Yes. I mean I think there's a bunch of moving parts, but maybe one of the easiest ones to really think through is just the mix of business. Our business is -- there's a hundred different ways that we can make our business more complicated. Some of these some very broad (inaudible) jokes to simplify it.

And we really have two sets of products. We have this Split Pay and then we have everything else. You think about Split Pay driving low single-digit kind of 1%, 1% to 2% transaction margins. Then you have core business delivering something that can be as high as 5% or 6%. And as those two mix between the two, and we continue to grow Split Pay business, we will see that number naturally drift down a little bit.

That's in addition to the macro environment we're in. Obviously we are in the middle of a fundamental shift in both the consumer and the rate environment, both of which do show up in our transaction costs. So I think those two things are probably the two biggest things to think about when looking at that number.

We got asked the question a lot over the past year. We kept getting asked 3% to 4%. Aren't you going to be above that -- and I think I got -- it goes literally every quarter and I keep telling people now 3% to 4%, 3% to 4%. There will be quarters we're going to be higher and maybe or are going to be on the lower end of that.

***But we look at the total ability to generate revenue and the cost of scale in this business and feel really good about that range, and we're at the high end of that range and which means that we have a lot of room to continue to absorb more macro headwind. We have a lot of room to continue to mix in this Split Pay and still be safely in that range.***

\*\*\*

123.    The statements identified above were misleading when made because the Company (a) did not "have a lot of room to continue to absorb more macro headwind," (b) the ability to generate revenue at the cost of scale was already impaired because of macroeconomic headwinds, including funding cost pressure due to rising interest rates, and (c) 0% loans could not mitigate the risks given the actual state of the Company's affairs and its reliance on traditional lending based on interest-bearing loans, loan sales and securitizations.

124.    The conversation continued and Defendant Linford was specifically asked about the possibility of whether RLTC as a percentage of GMV could decline to 3%, and he made the following materially misleading statements in response:

**Q- Robert Wildhack**

Yes. Yes. You make a good point though, declining from 4.3% to 3.7%. As rates ratchet higher, and there's a lot more concern around consumer finances, broadly speaking. The long-term guidance there is, again between 3% and 4%. So in light of everything that's happening this year, you're still at the high end of that long-term range. What would have to happen for that number to be 3%?

**A- Michael Linford**

Yes. I think we have to see a substantially higher mix in Split Pay in our business, or a rate environment that's, again moves very rapidly. Although we talked about this a lot. ***The rate environment moving on us inside the year really doesn't impact us. So that's more of a long-term statement, meaning at some point, rates do impact us, but not usually in the short term. So that's happening in this fiscal year. It really would have to be a mix of business driven.***

125.    The statements identified above were false when made because (a) Linford's representation that there would be no short-term impact from rate increases was not true, particularly because RLTC as a percentage of GMV was markedly below even 3% within months of when this false statement was made, and as a result (b) Linford's assurance that the impact from rates "inside the year" does not have an effect on Affirm was also false.

126.    As the conference proceeded, Defendant Linford's misrepresentations became more extreme, and he affirmatively stated that short-term risks from a rise in interest rates were "non-existent":

**Q- Robert Wildhack**

Yes. Let's move to funding costs now. In August, on the same earnings call we were referring to a minute ago, you mentioned that a 100 basis point move higher in rates beyond the current forward curve would weigh on your revenue less transaction cost as a percentage of volume by 10 to 20 basis points. In February of this year, that

same language pointed to a 40 basis point headwind RLTC as a percentage of GMV. So what changed in the last six months?

**A- Michael Linford**

Yes. Thank you. I want to clarify because the way to think about it is was going to tell you for the next time period what the impact is going to be, and so in February fiscal '23 was further away. So in February, we were talking about the impact in the near term as being 10 to 20 bps in the longer term and very long-term meeting beyond fiscal '23, then is being in 40.

***So the way to think about it is the total impact in the very long run is something on the order of 40 basis points, and there are step down the closer you get. The impact on rates to our business tomorrow is almost nonexistent. The impact on rates six months from now is controlled.*** The impact of rates a year from now is controlled, but still pretty high, as you saw on the 10 to 20 basis point number we guided to, the impact of rates on the very long term is less controlled.

And this is an important point where I think we do have an exposure to rates. It's a very real cost in our business either in our funding cost or it goes up in the yields that we're able to sell loans at -- and I think we're not denying that, and I hope everyone understands what we're meaning to say that. It just doesn't flow through as quickly as people think.

And what that does for us is that gives us time and time is a super valuable asset for us because our asset turns over so fast, we can replace the economic content with either more revenue sources or other cost mitigates that allow us to still deliver our unit economics in a higher rate environment.

***If we were subject to the rates impacting us day to day you'd see a very different posture from us or we wouldn't be as confident in our ability to absorb and react to the higher cost markets, the higher cost environment. But because we do have that shockers over built into our capital strategy, we're able to look ahead and say okay we see some cost headwinds coming, but we can absorb it and plan around it.***

127.    The statements identified above were misleading when made because (a) the Company's near-term rate exposure was more than 10 to 20 bps, (b) the Company's exposure beyond February 2023 to higher rates was more than 40 bps, (c) the impact of rising rates was not then "controlled" at the Company because of "shock" absorbers, and as a result, (d) Linford's assurance that the short-term impact from rates on the Company's business was "non-existent" was false.

128.    Later in the conference, Defendant Linford affirmatively misrepresented that the market should not worry about an increase in funding costs because the Company "managed that aggressively," funding costs do not rise "overnight" given all the firm commitments, and the Company plans well in advance to ensure funding capacity "in a pretty thoughtful way":

Q- Robert Wildhack

Yes. And as I think about the forward flow agreements in the warehouse lines, -- could you just talk about how the maturities and renewals are staggered? ***Should we be worried about a "cliff" when funding costs take a material step up?***

**A- Michael Linford**

***No, you shouldn't because we manage that pretty aggressively. So one of the reasons why it's so little of the funding capacity comes up this year is because we've been thoughtful about running ahead and renewing and extending and upsizing where we can. I think that may not always be the case, but much like with rates, these things don't happen to us overnight.***

***So we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity that we need.*** Therefore, staggered renewals are pretty important to us. So we don't like to put a lot of expiring capacity into one bucket.

And that's important because, look, there will be partners of ours who, for reasons not at all related to Affirm, they have to change their view of this particular asset. That's okay. We don't ever want to be a situation where one partner matters so much to us that they're doing something bad for them as a result. That means that you got to add more, you got to add diversity and you got to add staggered renewals so that no one's getting caught in any window, but it's bad for everybody.

129.    The statements identified above were materially misleading when made because (a) red flags about rising yields and funding costs had already emerged, and (b) within months of this statement, the Company disclosed that increased funding costs would negatively impact its performance and outlook rendering false Linford's statements that "these things don't happen overnight," and "we're able to plan ahead in a pretty thoughtful way to make sure that we've got the capacity we need."

130.    On September 27, 2022, Defendant Linford participated in an "Affirm Shareholder Fireside Chat." In response to a retail investor's question about then rising interest rates, Linford continued to minimize rate volatility with false claims of "built-in" "shock absorbers" and limited risk in the short-term even as the temporal proximity to extremely adverse news from his inconsistent representations began to shrink:

**Q- Moderator**

We have a question from a retail investor, Jorge R, who wants to know how Affirm's path to profitability will be impacted by rising interest rates alongside high inflation.

**A- Michael Linford**

Yes. I think, again, it's really important to remember that we believe our product is more valuable in these environments. It is the case that higher rates increase our costs. That they either increase our cost of funding or put pressure on the gain on sale lines in the P&L, and we talked about that. Frankly going back to February and in our Q2 last year earning call, we talked about how the rising rate environment would impact us, but it would flow through on a slower timeline than I think most folks have been thinking about.

The way we approach capital in the business is we go off and try to secure funding for loans before they're originated on our platform. And that gives us disadvantage [sic] of where originated into fairly certain cost and/or revenue profiles. *And so we're not quite as subject to the shocks. And make no mistake, the current rate environment certainly since beginning of this calendar year has been one of a rapid increase. You saw the Fed move in the market, expectations of rates continue to rise on a really quick basis.*

*And yet, our business model has built-in some shock absorbers to that, where it doesn't flow through immediately, and that allows us to be pretty planful around how we make our investments. While we're going to be prudent with our investments, we're still going to be investing and have been for this fiscal year as we think there's a lot of opportunity ahead. We think we're well-positioned to manage the credit side of that as I talked about before and we have continued to repeat our commitment to get to profitability on an adjusted operating income basis by the end of this year, despite the rate environment being as volatile as it is.*

131.    The statements identified above were materially misleading when made because the Company was, in fact, subject to rate shocks, did not have "built in shock absorbers" to minimize the

effect of rate increases, and was not positioned to "manage risks" in a volatile rate environment.  In addition, the temporal proximity between these misrepresentations and the Company's ultimate disclosure of rising funding costs due to increased interest rates that would lead to poor financial results enhances an inference of fraud.

132.    In a shareholder letter released on November 8, 2022 in connection with the financial results for the first quarter of 2023 that ended on September 30, 2022, the Company claimed that "our long-term model of 3-4% as a percentage of GMV is unchanged, and we expect to be at the high end of this range in the second half of FY '23."  The letter also asserted that "our sensitivity to additional interest rate increases has *decreased*," providing a range of potential impacts on RLTC that were lower than those provided in February 2022.

133.    These statements above were materially false and misleading when made because (a) there were serious risks of an increase in rate sensitivity, and (b) that increase put the long-term goal of attaining 3-4% RLTC as a percentage of GMV in jeopardy particularly in light of the inconsistent information that became public weeks after these statements were made.

134.    On December 6, 2022, Defendant Linford participated in another Affirm Shareholder "Fireside Chat."  In response to an analyst question about the impact of higher interest rates, Linford made the following misleading statements about the Company's rate exposure:

**Q- Dan Perlin**

Got it. And if you kind of reflect back on the last 12 months, maybe a little longer that what do you think you didn't think about, say, pre-COVID about the business or even during COVID like how prior -- are you surprised by the impact of the higher rates on the business? Is this something you kind of anticipated like this is an unprecedented time, I guess, between COVID and (inaudible) I just point your when you go back home, how do you think about this every day?

**A- Michael Linford**

                                    ***

I think that specifically with respect to rate, I feel really, really good about how well we predicted what the rates will do to our business back in February, which is way before the rate curve started moving as much as it did. We gave the market a framework for how to think about the impact of rates on our business in our February earnings call. And we've come in a little bit better in the framework we've given folks, but it's been a really good way to think about it. In the super near term, there's less impact because we have less exposure to floating rate debt.

But in the longer term, we have some gross exposure that it's our job to mitigate. And I feel really proud about our ability to manage and navigate through that. And yet, the challenges are by no means the highest. We still have a lot of work to do continue to navigate what are, like you say, unprecedented economic types. [sic]

135.     The statements identified above were materially misleading when made because (a) the Company was not then mitigating interest rate risk and did not then have the ability to "manage and navigate through that" without decimating its margins, and as a result (b) Defendant Linford already knew of a high risk that rising interest rates would impact the Company "in the super near term."

## CORE OPERATIONS

136.     The Company is a subprime lender that derives ***all of its revenue*** from lending related activities and the misrepresentations alleged here concerning the nature of the Company's business, and regulatory and interest rate risks all relate to the origination, sale and marketing of loans. Further, Defendants have been fixated on BNPL lending in their public statements to investors, and repeatedly touts them as its flagship offering, even though they represent under half of the Company's loan volume. The Company further claims that transparency in its product offerings and the avoidance of harm to consumers are its core principles.

137.     The core operations inference also applies to the misrepresentations about interest rates as managing interest risk was essential to ***all*** facets of the Company's business.  At bottom, the Company is a subprime lender that sells and packages loans, profits from interest and/or merchant

fees and servicing fees associated with loans, and there can be no doubt that interest rates impact all aspects of its business and did ultimately impact the Company's bottom line as alleged elsewhere herein.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

138.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

139.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

140.    Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

141.    During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

142.    The Company Board is currently comprised of Defendants Levchin, Liew, Michalek, Ming, Quarles, Rabois, Reses, White and Non-party Watson.   Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, five (5), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

143.    The Individual Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its financial results and future prospects.  Because of their advisory, executive, managerial, and directorial positions with the Company, the Individual Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

144.    The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

145.    The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

146.    The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

147.    The Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

148.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, the Individual Defendants are unable to comply with their fiduciary duties and prosecute this action.  They are in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuits brought under the Securities Exchange Act of 1934.

149.    Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Levchin**

150.    Defendant Levchin has served as the Company's Chairman of the Board of Directors (the "Board") and Chief Executive Officer ("CEO") at all relevant times.  The Company provides Defendant Levchin with his principal occupation for which he receives handsome compensation.

151.    As CEO, Defendant Levchin was ultimately responsible for all of the false and misleading statements and omissions that were made during the Relevant Period.

152.    Further, Defendant Levchin is a defendant in the Securities Class Action.  For these reasons, Defendant Levchin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Michalek**

153.    Defendant Michalek has served as a member of the Company's Board since May 2021.  Defendant Michalek has served as the Company's President, Technology, Risk and Operations since May 2021 and previously served as the Company's President, Technology from 2018 to May 2021.  Defendant Michalek served as the Company's Chief Technology Officer from

2015 to 2018. The Company provides Defendant Michalek with his principal occupation for which he receives handsome compensation.

154.     For these reasons, Defendant Michalek is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendants Ming, Quarles and Rabois**

155.     Defendants Ming, Quarles and Rabois served as members of the Audit Committee during the Relevant Period, with Defendant Quarles serving as chair. Pursuant to the Company's Audit Committee Charter, these Defendants are responsible for overseeing the Company's quality and integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, the Company's financial reporting process, and the Company's internal controls over financial reporting. These Defendants failed to ensure the quality and integrity of the Company's financial statements, as they are charged to do under the Audit Committee Charter, allowing the Company to make and file false and misleading financial statements with the SEC and to fail to maintain internal controls. The Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

**Defendant Levchin and Liew -- Investors' Rights Agreement**

156.     Defendant Levchin, entities affiliated with Lightspeed Venture Partners (Defendant Liew is partner at Lightspeed Venture Partners), entities affiliated with Spark Capital, entities affiliated with Thrive Capital, entities affiliated with Jasmine Ventures other holders of the Company's redeemable convertible preferred stock, and Shopify, are party to an amended and restated investors' rights agreement, dated as of September 11, 2020 (the "Investors' Rights Agreement"), pursuant to which the Company granted such holders certain registration rights with respect to the registrable securities held by them.

157.    Both Levchin and Liew have business relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders.

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

158.    Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

159.    The Individual Defendants owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

160.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

161.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

162.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

163.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending

securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### (Against The Individual Defendants for Gross Mismanagement)

164.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

165.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

166.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

167.   Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### (Against The Individual Defendants for Abuse of Control)

168.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

169.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

170.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of the Individual

Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

171.    The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

**FOURTH CAUSE OF ACTION**

**(Against The Individual Defendants For Unjust Enrichment)**

172.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

173.    During the Relevant Period, the Individual Defendants received bonuses, stock options, and/or similar such compensation from the Company that were tied to the financial performance of the Company.  The Individual Defendants were unjustly enriched thereby.

174.    To remedy the Individual Defendants' unjust enrichment, this Court should order them to disgorge their unjustly obtained bonuses and compensation.

175.    The acts and omissions of the Individual Defendants complained of in this Count have been undertaken willfully, knowingly, and maliciously, and/or with reckless disregard for their respective civil obligations, and accordingly the Company is entitled to recover punitive damages with respect to this Count.

**FIFTH CAUSE OF ACTION**

**(Against Defendants Levchin and Lindford for Contribution
Under Sections 10(b) and 21D of the Exchange Act)**

176.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

177.    Affirm and Defendants Levchin and Lindford are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Levchin and Lindford's willful and/or reckless violations of their obligations as officers of Affirm

178.    Defendants Levchin and Lindford, because of their positions of control and authority, respectively, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

179.    Accordingly, Defendants Levchin and Lindford are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

180.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Levchin and Lindford.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all the Individual Defendants and in favor of the Company, the

damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties;

C.      Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 14, 2023          **BIELLI & KLAUDER, LLC**

By: */s/ Ryan M. Ernst* _____
Ryan M. Ernst, Esq.
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Fl.
New York, NY 10017
Phone: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-aw.com

*Counsel for Plaintiff*